Chad S. Hummel (SBN 139005)
*chummel@sidley.com*
Theodore W. Chandler (SBN 219456)
*tchandler@sidley.com*
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Phone: (213) 896-6000
Fax: (213) 896-6600

[*Full list of counsel included in signature block*]

Attorneys for SK hynix Inc., SK hynix America Inc., and SK hynix memory solutions Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

NETLIST, INC.,

*Plaintiff and Counterclaim-Defendant,*

v.

SK HYNIX INC.,

*Defendant and Counterclaim-Plaintiff,*

and

SK HYNIX AMERICA INC., and SK HYNIX MEMORY SOLUTIONS INC.,

*Defendants.*

Case No.: 8:16-cv-01605-JLS-JCG

Assigned to: Judge Josephine L. Staton

**DEFENDANT SK HYNIX INC.'S COUNTERCLAIMS**

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

SK hynix Inc. ("SK hynix") asserts the following counterclaims against Netlist, Inc. ("Netlist") over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 2201, 2202, 1332, and/or 1367. SK hynix reserves the right to assert additional counterclaims as warranted by the facts revealed through discovery.

## NATURE OF ACTION

1. SK hynix brings the following counterclaims to address Netlist's ongoing refusal to abide by its binding contractual commitments to grant to SK hynix a license to patents that Netlist claims must be practiced to implement key industry standards relating to semiconductor memory products promulgated by a standard-setting organization called JEDEC on reasonable and non-discriminatory ("RAND") terms and conditions. SK hynix has, at all relevant times, been willing and able to take a license to those patents that Netlist claims are essential or potentially essential to the implementation of the relevant industry standards (i.e., Netlist's "standard essential patents" or "SEPs"). However, in contravention of the licensing commitments that Netlist made in order to have technology over which it claims to have patents incorporated into the relevant standards, Netlist has adopted a "hold-up" strategy of making outrageous license demands followed by litigation seeking coercive injunctive relief preventing the importation or sale of SK hynix's standard-compliant products in order to extract unreasonable and discriminatory royalties.

2. In order to remedy the ongoing and irreparable harm to SK hynix's business resulting from Netlist's failure to provide it a license to Netlist's claimed SEPs on RAND terms, SK hynix seeks: (a) a finding that Netlist has breached its contractual obligation to offer to SK hynix a license on such terms; (b) a declaration of the RAND terms and conditions on which Netlist is obligated to make a license available to SK hynix; and (c) a declaration that Netlist is not entitled to obtain injunctive or exclusionary relief in any forum against SK hynix for the alleged infringement of Netlist's SEPs in light of SK hynix's willingness to

take a license on RAND terms and to accept a judicially determined rate.

## THE COUNTERCLAIM PARTIES

3. SK hynix is a South Korean corporation with a principal place of business at 2091, Gyeongchung-daero, Bubal-eub, Icheon-si, Gyeonggi-do, Republic of Korea. SK hynix designs, manufactures, and sells semiconductor memory chips and modules for computer, electronic, and mobile devices ("memory products").

4. Defendant Netlist is a Delaware corporation with a principal place of business at 175 Technology Drive, Suite 150, Irvine, California 92618. Netlist holds patents that it asserts are relevant to memory products, including patents that it claims are essential to the implementation of various JEDEC standards. Netlist has stated to investors that it is focused on monetizing its patent portfolio and that it intends to pursue an intellectual property-based licensing business in which it will generate licensing revenue by selling or licensing its technology.

## JURISDICTION AND VENUE

5. This is a civil action for breach of contract and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

6. This Court has subject matter jurisdiction over the breach of contract claim pursuant to 28 U.S.C. §§ 1332 and/or 1367. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen or subject of a foreign state and a citizen of Delaware and California. The breach of contract claim forms part of the same case or controversy as the claims for patent infringement asserted by Netlist in this action.

7. This Court has subject matter jurisdiction over the declaratory judgment claim pursuant to 28 U.S.C. §§ 2201, 2202, 1332, and/or 1367. An actual case or controversy exists between the parties regarding what constitutes RAND terms and conditions for a license to Netlist's patents essential to JEDEC standards. The dispute is definite and concrete and touches the legal relations of

the parties, who have adverse legal interests. The matter in dispute exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

8. This Court has personal jurisdiction over Netlist for at least the following reasons: (1) Netlist has a principal place of business in California; (2) Netlist regularly solicits and conducts business in California and has minimum contacts in California; and (3) Netlist has submitted to the jurisdiction of the Court by having commenced a patent infringement action in this Court.

9. Venue is proper in the Central District of California pursuant to 28 U.S.C. §§ 1391(b), (d).

## FACTUAL BACKGROUND

### A. SK Hynix

10. Founded in 1983 in the Republic of Korea, SK hynix has become one of the largest providers of computer memory solutions in the global industry. SK hynix began its successful business developing and fabricating random-access memory (RAM) products for major computer manufacturers. The company continued expanding its partnerships and operations and currently has manufacturing facilities in South Korea and China, and over 27,000 employees. SK hynix has also developed a continuous record of innovation and varied semiconductor product offerings sold across the globe. It is one of the leaders in the market for various types of Dual In-Line Memory Module ("DIMM") products, widely used in the latest generations of computer and electronic devices.

11. SK hynix has historically invested heavily in R&D, consistently spending more than 8% of its annual revenue in R&D activities. In 2015 alone, SK hynix invested approximately $1.5 billion in R&D. It holds more than 11,000 issued patents worldwide, including approximately 7,800 patents issued by the United States Patent & Trademark Office.

///

**B. Netlist**

12. Netlist was founded in 2000 and became a publicly-traded company in 2006. Netlist is headquartered in California and offers various computer memory products. Netlist's net product sales totaled approximately $6.9 million for the fiscal year ending January 2, 2016, a decline of approximately 64% relative to the prior year. It currently has just over 100 employees.

13. Upon information and belief, Netlist has a portfolio of approximately 62 patents issued in the United States. According to its most recent annual report, Netlist spent approximately $6 million (USD) on R&D in the fiscal year ending January 2, 2016.

**C. JEDEC and Semiconductor Memory Standards**

14. JEDEC (formerly known as the "Joint Electron Device Engineering Council") is an independent, non-profit semiconductor engineering trade association and standardization body based in the United States. Over 300 companies in the computer and electronics industries are currently members of JEDEC, including SK hynix and Netlist.

15. JEDEC has become the global leader in developing open standards and publications for a broad range of semiconductor technologies, including memory products. As relevant here, JEDEC develops standards for semiconductor memory chips and modules, including standards implemented by SK hynix's products.

16. JEDEC's semiconductor memory standards enable interoperability, i.e., the ability of memory products made by different manufacturers to work together and with computer and electronic devices made by others. JEDEC standards are widely implemented and, for many types of semiconductor memory products, it is imperative that they comply with JEDEC standards in order to be commercially viable.

17. Member companies participate in JEDEC's standard-setting process

through over 50 committees and subcommittees that address various technological areas. Through a collaborative process, members contribute and vote on technical proposals for incorporation into JEDEC standards. Upon committee and Board approval, new standards are promulgated and made available to the public for free.

18. In some cases, JEDEC members own patents covering the technology they or others seek to have included in a JEDEC standard. A patent that includes a claim or claims that would necessarily be infringed by the use, sale, offer for sale, or disposition of a portion of a product in order to be compliant with an industry standard is referred to as a "standard essential patent" or an "SEP."

19. Each owner of an SEP can, unless restrained, demand and obtain exorbitant royalties for the use of its patent, far in excess of the value, if any, that the patented technology would command had it not been incorporated into a standard. If unwilling to pay such excessive royalties, firms wishing to implement the standard face the risk of being foreclosed from using any portion of the standard, including even unpatented and public domain technologies. This threat of foreclosure, if left unchecked, puts a manufacturer's huge investment in developing standard-compliant products at risk and, in effect, permits the possibility that the SEP holder may capture up to the value of the standard as a whole for each unique implementer, rather than the true value of its specific contribution to the standard. The exploitation of SEPs to extract unreasonable or discriminatory royalties is referred to as patent "hold-up."

20. The problem of "hold-up" is exacerbated in the context of standards, like those at issue here, as to which there are large numbers of SEPs and many different firms that claim to hold SEPs. The problem is likewise compounded when the products at issue, also like those here, may be required to implement multiple standards. The resulting problem of excessive aggregate royalties is referred as "royalty stacking".

21. In order to mitigate these risks, JEDEC—like many other standard-

setting organizations—has adopted a Patent Policy that seeks to ensure that any patents that would necessarily be practiced to implement a JEDEC standard will be available for manufacturers of standard-compliant products to license on RAND terms and conditions. Every firm that is a member of a JEDEC committee or a participant in a JEDEC committee meeting, including Netlist, agrees to abide by the JEDEC Patent Policy.

> *All Committee Members, as a condition of committee membership or committee Participation, agree to abide by JEDEC rules and procedures, including this JEDEC patent policy ("Patent Policy").*

Exhibit 1 (JEDEC Manual No. 21R) § 8.2.2.1.

22. Pursuant to the JEDEC Patent Policy, as a condition of committee membership or participation, all JEDEC committee members agree to disclose "Potentially Essential Patents" relevant to the work of the committee, and to license "Essential Patent Claims" on RAND terms and conditions:

> *All Committee Members, as a condition of committee membership and participation, agree to Disclose Potentially Essential Patents, as set forth more fully in 8.2.3, and to offer to license their Essential Patent Claims to all Potential Licensees on RAND terms and conditions, if and as consistent with 8.2.3 and 8.2.4.*

Exhibit 1 (JEDEC Manual No. 21R) § 8.2.2.1.

23. The JEDEC Patent Policy defines "Potentially Essential Patent" as a patent that is reasonably believed to contain one or more Essential Patent Claims. Exhibit 1 (JEDEC Manual No. 21R) § 8.2.1. "Essential Patent Claim" is further defined as those patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard. *Id.*

24. Member companies who disclose and agree to license on RAND terms their patents typically submit a "License Assurance/Disclosure Form" (also

known as a "Letter of Assurance" or "LOA") identifying the relevant JEDEC standard(s) and making one of the two following commitments specified by the JEDEC Patent Policy:

> *For any Essential Patent Claims held or controlled by the entity, pending or anticipated to be filed, the entity states:*
>
> ___ *(i) A license will be offered, without compensation, under reasonable terms and conditions that are demonstrably free of any unfair discrimination to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard; or*
>
> ___ *(ii) A license will be offered, with compensation, to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms and conditions that are demonstrably free of any unfair discrimination.*

Exhibit 1 (JEDEC Manual No. 21R) at A.3; *see also id.* § 8.2.5.

25. According to JEDEC's Patent Policy, disclosures and commitments with respect to one patent are deemed to include all patents claiming priority to the same filing. Exhibit 1 (JEDEC Manual No. 21R) § 8.2.1.

26. If a committee member who owns or controls patents essential or potentially essential to JEDEC standards does not disclose and agree to license them before the ballot closes, or notify the committee of an intention not to license through a so-called "Notice of Refusal", it is still obligated to offer licenses on RAND terms:

> *If a Committee Member, at its discretion, elects not to submit a License Assurance/Disclosure Form (see Annex A.3) at or before the time the ballot closes and does not otherwise provide notice of an unwillingness to license in accordance with 8.2.3.1, the Committee Member and its Affiliates will be deemed to have agreed to offer to grant licenses on RAND terms and conditions for all of its Essential*

*Patent Claims of the balloted Standard, if and as consistent with 8.2.4.*

Exhibit 1 (JEDEC Manual No. 21R) § 8.2.5.

27. Although JEDEC does not specifically set forth what terms and conditions are RAND in a given context, certain generally accepted principles have been recognized by participants in the industry, regulators, and the courts, including:

(a) RAND royalties should be set at levels consistent with the goal of promoting widespread adoption of the standard(s) in question;

(b) Reasonable royalties for RAND-encumbered SEPs should be at levels consistent with a reasonable aggregate royalty burden for the standard-compliant product(s);

(c) An SEP owner should be limited to a reasonable royalty that reflects the economic value of its specific patented technology to the standard(s) and product(s) in question and not any additional value conferred by incorporation of that technology in the standard;

(d) An SEP owner cannot discriminate among similarly situated licensees; and

(e) Having agreed to accept a reasonable royalty for use of its patented technology to implement the standard(s) in question, the holder of an SEP has relinquished any right it has to obtain injunctive relief at least against any firm that is willing and able to take a license on RAND terms.

28. The JEDEC Patent Policy is to be interpreted and governed under the laws of the State of New York. Exhibit 1 (JEDEC Manual No. 21R) § 8.2.10.

**D. Netlist's RAND Commitments**

29. Upon information and belief, Netlist currently owns 62 U.S. patents and 12 U.S. patent applications related to technologies used in various types of

DIMM products, including Load-Reduced ("LRDIMM"), Registered ("RDIMM"), and Non-Volatile ("NVDIMM") memory products.

30. Netlist is also a member of JEDEC and has participated in a number of JEDEC technical committees over time. Upon information and belief, Netlist representatives currently participate in the following committees: JC-11.10 (Microelectronic Ceramic Packages), JC-11.11 (Microelectronic Plastic Packages), JC-16 (Interface Technology), JC-63 (Multiple Chip Packages), and JC-64 (Embedded Memory Storage & Removable Memory Cards). Upon information and belief, at the time that the standards relating to RDIMM and LRDIMM technology were developed by JEDEC, Netlist was a member or attended the meetings of the committees that developed those standards.

31. To date, Netlist has disclosed that 38 of its patents and 2 of its patent applications are essential or potentially essential to JEDEC standards as shown in Exhibit 2 (List of Netlist Disclosed Patents).

32. Netlist has notified JEDEC that it will not offer licenses on RAND terms for several of its patents or applications it has disclosed as essential or potentially essential to JEDEC standards by submitting a "Notices of Refusal" (or "NORs"). As shown in Exhibit 2, Netlist has withdrawn some of its NORs over time and agreed to license those patents on RAND terms. Upon information and belief, Netlist currently refuses to license on RAND terms 13 of the patents or applications it has disclosed as essential or potentially essential to JEDEC standards. *See* Exhibit 2 (List of Netlist Disclosed Patents).

33. For the remaining 27 patents or applications Netlist has disclosed as essential or potentially essential to JEDEC standards—which include each of the six patents asserted by Netlist against SK hynix in the underlying patent infringement litigation—Netlist has made binding commitments to offer licenses on RAND terms by virtue of submitting the Letters of Assurance listed on Exhibit 3 and attached herein as Exhibits 4-44.

34. The commitments that Netlist has made to license its SEPs on RAND terms constitute binding contractual obligations that may be enforced by firms seeking to implement the JEDEC standards such as SK hynix.

**E. Netlist's Failure to Comply with its RAND Obligations**

35. Although it accepted the benefits of its membership in JEDEC and voluntarily undertook the obligation to license its SEPs on RAND terms in order to induce JEDEC to incorporate technologies over which Netlist claims to have patents into JEDEC standards, Netlist has failed and refused over many years to abide by these obligations. Netlist has engaged in a pattern of conduct indicating a general disregard of its RAND obligations, and the specific licensing demands that it has made on SK hynix have been both unreasonable and, upon information and belief, discriminatory.

36. Emblematic of Netlist's intent to withhold access to its SEPs in a strategic fashion, at the outset of the relevant period, in 2010, Netlist sought to limit its RAND commitments to allow itself the freedom to refuse to license its patents to certain memory buffer firms that it regarded as more direct competitors, while purporting to commit to license the same patents on RAND terms to the makers of other memory products. Only after JEDEC officials intervened and warned that such conditional RAND commitments were not permitted did Netlist extend its RAND commitments to the activities of the JC-40 committee that was focused on memory buffer technology.

37. Netlist's disregard of its RAND obligations has been reflected in the dealings between it and SK hynix over several years. [redacted], SK hynix and Netlist engaged in discussions concerning [redacted] and arrangement to [redacted]. As part of these discussions, SK hynix requested that Netlist provide it with a [redacted], including the [redacted]

[redacted]. Netlist indicated initially that it was willing to consider [redacted], and even suggested that the parties could [redacted]. Netlist later [redacted] to SK hynix, allegedly because of the [redacted]. SK hynix ultimately declined to [redacted] with Netlist at that time due to [redacted] and because of [redacted].

38. [redacted], the parties engaged in another round of negotiations for [redacted], this time relating to [redacted]. Netlist's [redacted] ultimately included [redacted], which Netlist now claims would, in addition to [redacted], have included a [redacted]. Because SK hynix was not confident that the [redacted] that Netlist sought [redacted] would be large enough to allow SK hynix to [redacted], the parties failed to reach an agreement.

39. In November 2015, Netlist entered into a Joint Development & License Agreement with Samsung Electronics Co., Ltd. ("Samsung") to jointly develop certain semiconductor memory products and cross-license their respective patent portfolios (the "JDLA"). Public disclosures indicate that Netlist received $8 million in cash and $15 million in the form of a note that is convertible into equity and which is secured by Netlist's patents.

40. [redacted] concluding its agreement with Samsung, [redacted]

[redacted], Netlist wrote to SK hynix asserting [redacted]. During subsequent negotiations, Netlist sought a royalty of [redacted], which was many multiples of: (a) what the publicly-available information indicated that Samsung had paid for a license to Netlist's portfolio under the JDLA; (b) the [redacted]; and (c) any reasonable royalty for a license to Netlist's patents.

41. In making its [redacted] on SK hynix, Netlist claimed—contrary to the facts—to own all of the intellectual property relevant to LRDIMM products. In fact, LRDIMM products reflect the standardized and non-standardized contributions of many firms, including SK hynix. There were many contributors to the development of the LRDIMM standards. Nine firms, in addition to Netlist, disclosed their ownership of patents potentially essential to the LRDIMM standard. If the other contributing firms sought royalties equivalent to the [redacted] royalty that Netlist demanded from SK hynix, the aggregate royalty for just the LRDIMM-specific technology in the relevant products (which incorporate a host of other technologies and standards) would be grossly excessive and significantly increase the cost of the products.

42. In response to Netlist's demands, SK hynix requested that Netlist provide it a license to Netlist's SEPs on terms substantially equivalent to those enjoyed by Samsung, but [redacted] Samsung is SK hynix's chief competitor in the sale of memory products generally and LRDIMM and RDIMM products specifically.

43. In the following months, the parties continued discussing the terms of a license and the technical merits of their respective patent portfolios. [redacted]

44. For its part, SK hynix has at all times been willing to license Netlist's patents essential to JEDEC standards on RAND terms and has negotiated (on its behalf and that of its affiliates) in good faith. For example, [redacted], SK hynix offered to pay Netlist a [redacted], which, taking account of SK hynix's smaller volume of sales, was based upon the conservative assumption that [redacted]. SK hynix emphasized in its negotiations with Netlist that [redacted]. Netlist [redacted], and has been [redacted].

45. At the time that Netlist filed this suit, Netlist provided SK hynix with a new demand of [redacted], and [redacted] for a license with a [redacted]. Given the anticipated volume of sales over the relevant periods, Netlist's latest demands would still potentially require SK hynix to pay [redacted], far in excess of what publicly-available information indicates Samsung paid for a longer term license covering its greater sales plus an investment in

Netlist, and far in excess of any reasonable royalty. Because of the [redacted] proposed in Netlist's latest demand, it actually represents a [redacted].

46. In sum, Netlist has failed to offer RAND license terms to SK hynix and has breached its RAND obligations regarding its essential patents. Upon information and belief, Netlist has unfairly discriminated against SK hynix by refusing to offer similar license terms as those enjoyed by SK hynix's chief competitor, Samsung.

**F. Netlist's Litigation Against SK Hynix**

47. On August 31, 2016, Netlist initiated a patent infringement action against SK hynix and two of its affiliates in the U.S. District Court for the Central District of California, Civil Action No. 8:16-cv-01605-JLS-JCG. In addition to damages, Netlist sought a permanent injunction against SK hynix's sale of the accused standard-compliant products.

48. The following day, Netlist initiated an investigation against SK hynix at the U.S. International Trade Commission ("ITC") alleging infringement of the same patents asserted in the California action. In its ITC action, Netlist sought an exclusion order barring the importation of SK hynix's accused standard-compliant products, as well as a cease and desist order directed to inventory in the U.S. The only relevant forms of relief that the ITC can grant are exclusionary in nature.

49. The patents asserted in the California and ITC actions are U.S. Patent Nos. 8,756,364; 8,516,185; 8,001,434; 8,359,501; 8,689,064; and 8,489,837 (collectively, the "Asserted Patents"). In its pleadings, Netlist describes the '364 and '185 patents as relating to improvements in performance or memory capacity for memory modules. Netlist describes the '434, '501, and '064 patents as relating to self-testing electronic memory modules. Netlist describes the '837 patent as relating to memory modules that perform handshaking during or upon completion

of initialization.

50. Netlist's litigation campaign against SK hynix (and its affiliates) further confirms its intent to avoid its RAND obligations. Netlist has singled out SK hynix in an attempt to extract supra-competitive royalties and leverage the threat of injunctions to exclude SK hynix from using Netlist's patented technology. But in promising to offer to license any of its patents essential or potentially essential to JEDEC standards on RAND terms and conditions, Netlist surrendered any right to pick and choose which standard implementers could receive licenses and exclude implementers—like SK hynix—who are able and willing to license on RAND terms.

## FIRST CAUSE OF ACTION

### Breach of Contract

51. SK hynix realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1-50.

52. Subject to the terms and conditions of the JEDEC Patent Policy, Netlist has made a contractual commitment and is obligated to offer to implementers of JEDEC standards, including SK hynix and its affiliates, licenses to its essential patents on RAND terms and conditions. In each of its Letters of Assurance, Netlist promised to make available to implementers of the identified JEDEC standards a license "under reasonable terms and conditions that are demonstrably free of any unfair discrimination." Exhibits 4-44.

53. Netlist has claimed in its negotiations with SK hynix that the patents and patent applications subject to Netlist's letters of assurance are essential to (i.e., would necessarily be infringed by complying with) JEDEC standards.

54. Netlist has also represented to SK hynix that it owns additional patents that are, in fact, essential to JEDEC standards. To the extent that any of Netlist's patents or applications that Netlist claims are essential were not disclosed to JEDEC and to the extent that Netlist has not otherwise provided to JEDEC a

Notice of Refusal with respect to such patents, JEDEC's Patent Policy obligates Netlist to license them on RAND terms.

55. SK hynix and its affiliates are third-party beneficiaries to Netlist's RAND obligations. SK hynix has at all times been willing to take a license (on its behalf and that of its affiliates) to Netlist's essential patents on RAND terms and conditions.

56. Netlist has nonetheless failed to offer a license to its essential patents on RAND terms and conditions, and has rejected the RAND offers made by SK hynix. Netlist instead has made royalty demands that are wholly disproportionate to the royalties that its patents should command under a reasonable calculation and, upon information and belief, discriminatory in comparison to what SK hynix's similarly-situated competitor, Samsung, has paid for a license.

57. Netlist has further sued SK hynix and its affiliates for alleged infringement of patents it claims are essential to JEDEC standards, seeking injunctive relief to bar SK hynix's products from the U.S. market notwithstanding the fact that SK hynix is, and at all times relevant hereto has been, willing, able, and entitled to take a license to Netlist's patents on RAND terms.

58. Netlist has therefore breached its contractual obligations to license its essential patents to SK hynix and its affiliates on RAND terms and conditions.

59. As a result of Netlist's contractual breach, SK hynix has been injured in its business or property because it has been denied access to a license to Netlist's claimed SEPs on RAND terms, a license which can only be obtained from Netlist. SK hynix's inability to obtain a license to Netlist's SEPs on RAND terms, coupled with Netlist's litigation campaign against SK hynix, threaten SK hynix with the imminent loss of customers and potential customers, loss of goodwill and product image, loss of sales, litigation costs, uncertainty in business planning, and uncertainty among customers and potential customers.

60. SK hynix has suffered and will continue to suffer irreparable injury by

reason of Netlist's acts, practices, and conduct alleged above unless the Court enjoins such acts, practices, and conduct.

**SECOND CAUSE OF ACTION**

**Declaratory Judgment of RAND Terms for a License to Netlist's Patents Essential to JEDEC Standards**

61. SK hynix realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1-60.

62. SK hynix (on its behalf and that of its affiliates) has expressed its willingness to take a license to Netlist's patents essential to JEDEC standards. Netlist has an obligation to offer SK hynix a license to those patents on RAND terms and conditions.

63. However, there is a definite and concrete dispute between SK hynix and Netlist regarding what constitutes RAND royalties for a license to Netlist's patents essential to JEDEC standards.

64. Unless and until RAND royalties for a license to Netlist's patents essential to JEDEC standards are determined, SK hynix will continue to be harmed by the potential disruption of its business, ongoing litigation and threat of potential litigation, threat of injunctions against SK hynix's products, imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

65. SK hynix is therefore entitled to a declaratory judgment setting forth the RAND terms and conditions for a license to Netlist's patents essential to JEDEC standards, including the applicable royalty rate, to which it is entitled.

66. SK hynix is further entitled to a declaratory judgment that it has a right to obtain a license to Netlist's patents essential to JEDEC standards under the RAND terms and conditions to be determined by the Court.

67. SK hynix is willing to be bound and take a license to Netlist's patents essential to JEDEC standards on the RAND terms and conditions to be determined

by the Court (subject to any applicable right of appeal).

## THIRD CAUSE OF ACTION

### Declaratory Judgment that Netlist is Barred from Seeking and/or Enforcing Injunctive Relief Against SK hynix Based on Patents Essential to JEDEC Standards

68. SK hynix realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1-67.

69. Netlist represented to JEDEC and has claimed in its negotiations with SK hynix that it owns patents and patent applications that are essential or potentially essential to (i.e., would necessarily be infringed by complying with) JEDEC standards, including the Asserted Patents.

70. Subject to the terms and conditions of the JEDEC Patent Policy, Netlist has made a contractual commitment and/or is otherwise obligated by the JEDEC Patent Policy to grant implementers of JEDEC standards, including SK hynix and its affiliates, licenses to its essential patent on RAND terms and conditions.

71. Inherent in Netlist's RAND commitments is an admission that monetary compensation in the form of a RAND royalty is adequate to compensate Netlist for use of its SEPs in the implementation of JEDEC standards.

72. SK hynix (on its behalf and that of its affiliates) has expressed its willingness to take a license to Netlist's patents essential to JEDEC standards. At all relevant times, SK hynix has negotiated with Netlist in good faith and has been willing to take a license to Netlist's patents essential to JEDEC standards on RAND terms and conditions, including making a RAND offer for a license to Netlist's patents. SK hynix is willing to be bound and take a license to Netlist's patents essential to JEDEC standards on the RAND terms and conditions to be determined by the Court (subject to any applicable right of appeal).

73. There is a definite and concrete dispute between SK hynix and Netlist

regarding whether, alone or in combination with the negotiation history between the parties, Netlist's RAND obligations bar Netlist from seeking and/or enforcing injunctive relief against SK hynix for alleged infringement of patents essential to JEDEC standards, including the Asserted Patents.

74. Netlist has in fact sought injunctive relief against SK hynix for alleged infringement of the Asserted Patents before this Court and in the ITC.

75. As a result of the threat of injunctive relief, SK hynix has been harmed and will continue to be harmed by the potential disruption of its business, imminent loss of profits, loss of customers and potential customers, loss of sales, and loss of goodwill and product image, and litigation costs. If injunctive relief were granted, SK hynix would be irreparably harmed by the disruption of its business, loss of profits, loss of customers and loss of potential customers, loss of sales and goodwill and product image.

76. SK hynix is therefore entitled to a declaratory judgment that Netlist is barred by its RAND obligations from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards.

## PRAYER FOR RELIEF

WHEREAS, Plaintiff SK hynix prays that this Court enter judgment against Defendant Netlist as follows:

A. Adjudge and decree that Netlist is liable for breach of contract;

B. Grant injunctive relief requiring Netlist to offer a license to the patents it asserts are essential or potentially essential to the JEDEC standards—including the Asserted Patents—on reasonable terms and conditions that are demonstrably free of unfair discrimination;

C. Declare the RAND terms and conditions, including royalties, for a license to Netlist's patents essential or potentially essential to JEDEC standards;

D. Declare that SK hynix and its affiliates have a right to obtain a license to Netlist's patent essential to JEDEC standards under the terms and conditions to be determined by the Court;

E. Enjoin Netlist from further demanding excessive, non-RAND royalties from SK hynix;

F. Declare that Netlist is barred from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards;

G. Enjoin Netlist from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards; and

H. Such other equitable relief as this Court deems just and proper.

Date: November 7, 2016

Respectfully submitted,

*/s/Brian R. Nester*

Chad S. Hummell (SBN 139005)
*chummell@sidley.com*
Theodore W. Chandler (SBN 219456)
*tchandler@sidley.com*
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Phone: (213) 896-6000
Fax: (213) 896-6600

Brian R. Nester (*pro hac vice*)
*bnester@sidley.com*
Wonjoo Suh
*wsuh@sidley.com*
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Phone: (202) 736-8000
Fax: (202) 736-8711

David T. Pritikin (*pro hac vice*)
*dpritikin@sidley.com*
Richard A. Cederoth (*pro hac vice*)
*rcederoth@sidley.com*
David Giardina (*pro hac vice*)
*dgiardina@sidley.com*
SIDLEY AUSTIN LLP
1 S. Dearborn Street
Chicago, IL 60603
Phone: (312) 853-7000
Fax: (312) 853-7036

Kenneth L. Nissly (SBN 77589)
*knissly@nisslylaw.com*
LAW OFFICES OF KENNETH L. NISSLY
P.O. Box 3448
Saratoga, CA 95070-1448
Phone: (408) 398-7043

Attorneys for
SK hynix Inc., SK hynix America Inc., and SK hynix memory solutions Inc.