Chad S. Hummel (SBN 139005)
*chummel@sidley.com*
Theodore W. Chandler (SBN 219456)
*tchandler@sidley.com*
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Phone: (213) 896-6000
Fax: (213) 896-6600

[*Full list of counsel included in signature block*]

Attorneys for SK hynix Inc., SK hynix America Inc., and SK hynix memory solutions Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| Netlist, Inc.,<br><br>*Plaintiff and Counterclaim-Defendant,*<br><br>vs.<br><br>SK hynix Inc.,<br><br>*Defendant and Counterclaim-Plaintiff,*<br><br>and<br><br>SK hynix America Inc. and SK hynix memory solutions Inc.,<br><br>*Defendants.* | No. 8:16-cv-01605-JLS-JCG<br><br>**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** |

# TABLE OF CONTENTS


I. BACKGROUND ........ - 1 -

II. ARGUMENT ........ - 2 -

A. Legal Principles ........ - 2 -

B. DISPUTED TERMS AND PHRASES ........ - 3 -

1. "generate" ('434, '501, '064 patents) ........ - 3 -

2. "test" ('434, '501, '064 patents) ........ - 6 -

3. "self-testing memory module" ('434 patent) ........ - 7 -

4. "interrupt routine" ('837 patent) ........ - 8 -

5. "notification signal" / "Notification signal to the memory controller indicating at least one status of the at least one initialization sequence" ('837 patent) ........ - 10 -

6. "a controller circuit" / "a notification circuit" ('837 patent) ........ - 12 -

7. "a controller circuit configured to cause the memory module to enter the initialization mode" ('837 patent) ........ - 15 -

8. "mode" ('837 patent) ........ - 16 -

9. "memory module" ('837 patent) ........ - 17 -

10. "isolate" terms ('185 and '364 patents) ........ - 18 -

a. "Isolation" means "electrical separation" in the context of the '364 and '185 patents ........ - 19 -

b. Netlist improperly rewrites "other memory device" and "second memory device" to mean "*unselected* memory device" ........ - 21 -

a. Netlist improperly rewrites "in response to the module control signals" to mean "during memory access operations" ........ - 22 -

11. "selectively allow data transmission" ('185 patent) ........ - 23 -

12. "output control signal" ('185 patent) ........ - 25 -

III. CONCLUSION ........ - 25 -

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aylus Networks v. Apple, Inc.*,
No. 2016-1599, 2017 WL 1946961 (Fed. Cir. 2017) .......................................*passim*

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) ........................................................................ 13

*Becton, Dickinson & Co. v. Tyco Healthcare Grp.*,
616 F.3d 1249 (Fed. Cir. 2010) ........................................................................ 22

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004) ........................................................................ 21

*Convolve, Inc. v. Compaq Computer Corp.*,
812 F.3d 1313 (Fed. Cir. 2016) ........................................................................ 13

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ........................................................... 17, 22, 24

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) ........................................................................ 11

*Hill-Rom Servs. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) .......................................................................... 2

*KCJ Corp. v. Kenetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000) ........................................................................ 13

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ........................................................................ 22

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................................... 2

*Saffran v. Johnson & Johnson*,
712 F.3d 549 (Fed. Cir. 2013) ....................................................................... 7, 11

*SanDisk Corp. v. Kingston Tech. Co., Inc.*,
695 F.3d 1348 (Fed. Cir. 2012) ........................................................................ 13

*Scanner Tech. Corp. v. ICOS Vision Sys. Corp.*,
365 F.3d 1299 (Fed. Cir. 2004) ............................................................ 15, 16

*Teva Pharmaceuticals USA v. Sandoz, Inc.*,
135 S. Ct. 831 (2015).......................................................................................... 3

*TomTom, Inc. v. Adolph*,
790 F.3d 1315 (Fed. Cir. 2015) .............................................................................. 2

*Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) .............................................................................. 7

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) ..................................................................... 16, 17

*Z4 Tech., Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007) .............................................................................. 5

Defendants SK hynix Inc., SK hynix America Inc. and SK hynix memory solutions Inc. ("Defendants") hereby submit this Opening Claim Construction Brief pursuant to the Court's Scheduling Order of January 4, 2017 [ECF No. 101], as amended on May 8, 2017.

## I. BACKGROUND

Defendants make two types of DDR4 memory modules containing DRAM chips that are widely used in the latest generation of computer servers: Load-Reduced Dual In-Line Memory Modules ("LRDIMMs") and Registered Dual In-Line Memory Modules ("RDIMMs"). Plaintiff Netlist, Inc. ("Netlist") accuses Defendants' LRDIMMs and RDIMMs of infringing six patents, all of which relate to memory modules: U.S. Patent Nos. 8,756,364 ('364) (JX-0001),[1] 8,516,185 ('185) (JX-0002), 8,001,434 ('434) (JX-0003), 8,359,501 ('501) (JX-0004), 8,689,064 ('064) (JX-0005), and 8,489,837 ('837) (JX-0006).

Plaintiff has accused the same devices of infringing five of the same patents before the International Trade Commission.[2] Inv. No. 337-TA-1023. The ALJ held trial on May 8–11, 2017 and will issue an Initial Determination by October 10, 2017. Several of the claim terms construed below are also disputed in the ITC investigation and also in the Patent Office.[3]

[1] The parties have agreed to use the same exhibit numbers that were used in the recent ITC trial between the parties. *See* Joint Stipulations to Coordinate Filing Exhibits in Support of Claim Construction Briefs 2–3 (filed May 25, 2017) (Doc. 121). The parties have also agreed to file a single set of exhibits after briefing is completed. *Id.*

[2] Netlist initially asserted the '364 patent before the ITC, but dropped that patent before trial. *See In the Matter of Certain Memory Modules & Component Thereof, & Prods. Containing Same*, USITC Inv. No. 337-TA-1023, Netlist's Mot. for Partial Termination of the Investigation with Respect to U.S. Patent No. 8,756,364 & Request for Mot. Consolidation, Mot. No. 1023-32 (May 4, 2017).

[3] Defendant has filed petitions for *inter partes* review ("IPRs") on all of the asserted patents. To date, the Patent Trial and Appeal Board ("PTAB") has instituted three IPRs (IPR2017-00548, for the '837 patent, IPR2017-00549 for the '364 patent, and IPR2017-00560 for the '064 patent). *See* https://ptab.uspto.gov/. Defendants expect Institution decisions for the remaining IPRs to issue before this Court's *Markman* hearing.

## II. ARGUMENT

### A. Legal Principles

The goal of claim construction is to determine the meaning of the claims to the hypothetical "person of ordinary skill in the art" at the time the patent application was filed, when read in light of the specification and file history." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). Claim terms are generally given their ordinary and customary meaning to a person of ordinary skill in the art, unless the patentee acts as his own lexicographer by ascribing a specific definition to the term or the patentee disavows the full scope of a claim term. *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014).

Claim construction begins with the language of the claims. *Phillips*, 415 F.3d at 1312–14; *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1328 (Fed. Cir. 2015). Not only is "the context in which a term is used in the asserted claim . . . highly instructive," but "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314. The claims "must be read in view of the specification, of which they are part." *Id.* at 1315. The Federal Circuit has explained that the specification "is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term." *Id.* In addition, courts "should also consider the patent prosecution's history," which "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.* The claims, specification, and prosecution history comprise the intrinsic record.

Additionally, extrinsic evidence, such as technical dictionaries, may "help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean," but such evidence should be considered in the context of the intrinsic record. *Phillips*, 415 F.3d at 1319.

As the Supreme Court recently explained in *Teva Pharmaceuticals USA v. Sandoz, Inc.*, 135 S. Ct. 831, 838 (2015), claim construction is an issue of law for the court to decide that may involve underlying issues of fact as to the meaning of terms to a person of skill in the technical field. If there are factual disputes about the underlying factual issues, the Court may make factual findings that are subject to clear error review. *Id*. However, determining whether a claim term has a particular meaning is always a question of law for the Court. *Id.* at 841 ("if a district court . . . makes a factual finding . . . the district court must then conduct a legal analysis: whether a skilled artisan would ascribe that same meaning to that term *in the context of the specific patent claim under review*.").

## B. DISPUTED TERMS AND PHRASES

### 1. "generate" ('434, '501, '064 patents)

| SK hynix's proposed construction | Netlist's proposed construction |
|---|---|
| Produce (*i.e.*, bring into existence) | Produce (i.e., bring into existence, including by transformation or modification of information and/or data received from another component) |

The intrinsic and extrinsic evidence mandates construing "generate" as "produce (*i.e.*, bring into existence)." This is the very construction Netlist urged to the PTAB—and the PTAB did adopt. As Netlist argued before the PTAB and its ITC expert confirmed, "the term 'generate' is used consistently in the specification and the claims with the ***notion of producing data in the data handlers*** of claim 1 of the 434 patent." CX-0005C at Q/A 137; RX-0910.030–031 (IPR2014-00970, PO Prelim. Resp.).

The asserted claims of the '434, '501 and '064 patents ("self-test patents") require the claimed memory module include "a data handler . . . configured to generate data," or an equivalent limitation. JX-0003 at 16:42–48; JX-0004 at 16:42–46; JX-0005 at 18:17–19. The specifications for the self-test patents are substantially identical, and, as the PTAB observed, each uses "produce" as a synonym for

"generate": "In some embodiments, the controller module 22 and the data module 28 *produce* memory addresses . . . In some embodiments, *for example*, the controller module 22 and the data module 28 *generate* the memory interface signals." *E.g.*, JX-0003 at 6:6–12 (emphases added); *see* RX-0348.027–28.

In addition, the specification teaches that data generation involves an actual production of data. The specification provides that "data may be generated *based [on] previously written data* (e.g., *inverting each of the bits* of a previously written data word) in some embodiments." JX-0003 at 10:57–60 (emphasis added). Thus, the data handler actually originates the value of the bit prior to writing it to the memory. The specification also explains that "[t]he data signals and/or patterns of data signals may be *based on information* (e.g., programming or configuration information) the data handler logic element 46 receives from the control module 22, for example." *Id*. at 10:33–37 (emphasis added).

Moreover, construing "generate" to mean "produce" preserves the self-test patents' stated purpose of obviating the need for use of expensive ATE. JX-0003 at 1:57–2:5. That is why the specification discloses a module that self-tests by generating its own test data. RX-0008C (Hoffman Initial WS) at Q/A 57; JX-0003 at 3:28–41, Figs. 3, 5. Figure 3's data generation element 54—and not some other test equipment—actually originates the test data. JX-0003, Fig. 3, PX-3 at 368:3–24; RX-137C (Choi Dep., Jan. 26, 2017) at 133:23–134:5 (inventor testifying that "our idea was to . . . obviate the need, the usage of this expensive ATE equipment.").

As Netlist admitted before the PTAB, according to the self-test patents, "being configured to generate data is ***different than merely receiving*** data patterns." RX-0912.024-025 (emphasis added). The claims and specification distinguish between "generate" and merely providing, writing, or inputting data produced by a component other than the data handler. The claim language uses "generate" separate and apart from the terms "writing" or "providing," indicating that "generate" cannot encompass "writing" or "providing." *E.g.*, JX-0003 at 16:42–48 ("to *generate* data for *writing*"),

JX-0004 at 16:42–46 (same), JX-0005 at 18:17-21 ("to *generate* test data and to *provide* the test data") (emphases added); *Z4 Tech., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1348 (Fed. Cir. 2007) (holding that two different terms used in the same claim cannot mean the same thing).

In addition to the overwhelming weight of the intrinsic record, all experts before the ITC and PTAB opined that "generate" necessarily includes "produce." RX-0931.038 (IPR2017-01372, Decl. of Dr. Carl Sechen, Jun. 15, 2015) ¶ 100; CX-0005C at Q/A 126; CX-0931C (Murphy Initial WS) at Q/A 432; RX-0008C at Q/A 126; RX-1586C (Hoffman Rebuttal WS) at Q/A 212. For example, Netlist's ITC validity expert admitted that generating data must mean bringing it into existence, testifying that "generate" does ***not*** include using existing data because "[t]he value is ***already*** in existence." RX-0340C (Murphy Dep., Mar. 26, 2017) at 173:18–184:19 (emphasis added); *id*. at 181:2–10 (the process of copying and repeating is not generating but "simply a passthrough").

Before the PTAB, Netlist argued that "generate" means "produce (*i.e.*, bring into existence)" and "construing 'generate' to mean ***anything but*** '*produce*' would be inconsistent with the specification of the [self-test] patent[s]." RX-910.032 (emphasis in original and added); RX-0912.022; RX-0919.029–31; RX-0923.025–31. Netlist represented that "it is a '*given'* that data must first be ***produced (i.e., brought into existence***, *see* Ex. 2009, Merriam Dictionary, at 484) before it can be sent." RX-930.038 (emphasis added and in original). Netlist's IPR expert, Dr. Sechen opined that "one of ordinary skill in the art would understand that data must first be ***produced (brought into existence***, Ex. 2009 at 484) before it can be sent" and "[o]ne of ordinary skill in the art would understand that the alleged address and control signals cannot both *already exist* in the control module and also be caused to be ***produced (that is, brought into existence***, *see* Ex. 2009 at 484) by a component *after* the control module." RX-0931.037, .051 (emphasis added and in original). The PTAB agreed with Netlist that produce means bringing data into existence, holding that "produce"

means "originate" and does not encompass merely providing, propagating, or sending the same information and/or data received from another component. RX-0347.014.

This construction of generate formed the basis for Netlist arguing—and the PTAB agreeing—that prior art did not invalidate the self-test patent claims because the act of selecting and providing data that was produced before being provided to a circuit—without transforming or modifying that data—is not "generating." RX-0930.033, .049–52 (arguing prior art's CMD_REQ does not generate or program signals but instead "simply enables the alleged data handlers to receive [the pre-existing data]"); RX-0347.029–30; *see Aylus Networks v. Apple, Inc.*, No. 2016-1599, 2017 WL 1946961, at *6 (Fed. Cir. 2017) (claim scope limited by disclaimers during *inter partes* review). Thus, intrinsic and extrinsic evidence, as well as Netlist's own prior statements warrant construing "generate" to mean "produce (*i.e.*, bring into existence)."

**2. "test" ('434, '501, '064 patents)**

| <u>SK hynix's proposed construction</u> | <u>Netlist's proposed construction</u> |
|---|---|
| Check for bit failures or defects | Plain and ordinary meaning (e.g., check for failures, defects, correct memory access speed) |

The term "test" in the asserted claims[4] means to "check the memory for bit failure or defects." Both the intrinsic and extrinsic evidence demonstrates that a person of ordinary skill in the art would understand that the plain and ordinary meaning requires checking the memory for bit failures or defects.

The specification—which is the "single best guide to the meaning of a disputed

[4] The '434, '501, and '064 patents each requires testing: "wherein the circuit is configured to test the memory devices," JX-3 at 16:49–50; "wherein the memory system is configured to test the one or more memory chips," JX-4 at 16:47–48; "wherein the memory module is configured to obtain test results by reading from the respective set of at least one memory device in response to signals from the module controller and by comparing data read from the respective set of at least one memory device with the test data provided to the respective set of at least one memory device," JX-5 at 18:22–23. The construction above applies to each of these limitations.

term"—consistently describes testing as evaluating whether the memory contains bit failures and defects. *See Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1362–63 (Fed. Cir. 2016). All of the embodiments describe testing whether memory cells stored data without defects or failures. *See, e.g.*, JX-0003 at 5:56–58, 11:11–12, 14:19–22.

The background section similarly describes testing memory chips for bit failures and for defects. *Id.* at 1:36–52. The specification warns that "it is important to ensure proper memory operation in an electronic system," so manufacturers test for "defects" in each of the three phases of manufacture. *Id.* at 1:27–56. Specifically, the "first test phase" "involves checking for ***bit failures***" and "[t]he second phase may also include checking for ***bit failures*** in individual memory chips." *Id.* at 1:41–47. Testing should be construed to check for bit failures and defects, consistent with every embodiment and description in the specification. *See Saffran v. Johnson & Johnson*, 712 F.3d 549, 558–60 (Fed. Cir. 2013) (construing term based on term's consistent and exclusive use specification).

### 3. "self-testing memory module" ('434 patent)

| SK hynix's proposed construction | Netlist's proposed construction |
|---|---|
| Memory module that is able to test one or more elements of the memory module without the use of an external device | Memory module that is able to test one or more elements of the memory module (either without the use of an external device or with the use of both an internal device and an external device) |

The intrinsic record compels construing "self-testing memory module" as "memory module that is able to test one or more elements of the memory module without the use of external device." First, the claims require a "***self***-testing memory" module. *E.g.*, JX-0003 at claim 1. The term "self" indicates the module is able to test without the use of an external device, and the claims describe exactly such a module that internally generates signals. *E.g.*, *id.* at claim 1 (self-testing module comprising a circuit "configured to test memory devices"), claim 29 (describing a method of self-testing using internally-generated data). Similarly, in each embodiment, once testing

begins, the memory module internally generates the requisite address and control signals and the requisite data for executing the test without an external device providing such signals. *Id.* at 3:42–62. None of the embodiments describe the self-testing module receiving signals from, or otherwise being controlled by, an external device during the testing procedure. *Id.*; RX-0008C at Q/A 121. Indeed, the very purpose of the invention was to overcome the expense and other drawbacks associated with, *inter alia*, external testing hardware (*e.g.*, ATE). JX-0003 at 1:58–2:5.

The prosecution history similarly supports exclusion of an external device. During the '434 patent examination, the examiner rejected original claim 1 because it did not recite any limitations that embody the "self-testing" aspect of the claimed "self-testing memory module." JX-0009.00118. In response, Netlist amended claim 1 to add the limitation "wherein the circuit is configured to test the memory devices using the address and control signals ***generated*** by the control module and the data ***generated*** by the plurality of data handlers." *Id.* at 151 (emphases added). Before the PTAB, Netlist argued that "the broadest reasonable construction of 'self-testing memory module' in light of the specification is: 'memory module that is able to test one or more elements of the memory module ***without the use of a testing device external to the memory module***.'" RX-0910.31 (emphasis added). *Aylus* precludes Netlist from arguing a broader construction now. *Aylus Networks*, 2017 WL 1946961, at *6.

**4. "interrupt routine" ('837 patent)**

| <u>SK hynix's proposed construction</u> | <u>Netlist's proposed construction</u> |
|---|---|
| Computer instructions that cause operations in response to a signal requesting attention | Plain and ordinary meaning, for example: appropriate operation or operations |

The plain and ordinary meaning of "*interrupt routine*" to a person of ordinary skill, based on the intrinsic and extrinsic evidence, is "computer instructions that cause operations in response to a signal requesting attention." *See* RX-0009C (Wedig Initial

WS) at Q/As 81-91; RX-1587C at Q/As 84-94.

This meaning of the term follows from the broader claim language: "wherein the at least one notification signal triggers the memory controller to execute an interrupt routine." JX-0006 at 14:19–20. The specification explains that receipt of the "notification signal . . . triggers execution of the interrupt routine, which interrupts the CPU" and requires the CPU and/or memory controller to give "immediate attention" to the completed initialization sequence. *Id.* at 7:26–33.

Consistent with the specification, dictionaries contemporaneous with the '837 Patent confirm that a person of ordinary skill would understand that execution of an interrupt routine requires the processing of computer instructions. For example, the Microsoft Computer Dictionary defines "routine" to be "[a]ny section of code that can be invoked (executed) within a program." RX-0993.468. This definition was recently confirmed in trial testimony on this patent. PX-3 at 764:24–765:3 ("An interrupt routine is, first of all, a type of routine. A routine is a part of a program . . . programs are all made up of instructions."). Nothing in the '837 patent purports to alter the meaning of this well-known term of art, and Netlist points to nothing. The plain and ordinary meaning of "routine" is therefore a section of code, *i.e.*, computer instructions. The same dictionary also defines the verb "interrupt" to mean "[a] signal from a device to a computer's processor requesting attention from the processor." RX-0993.295. Combining these definitions together in a manner consistent with the intrinsic evidence confirms that the plain and ordinary meaning of "*interrupt routine*" is "computer instructions that cause operations in response to a signal requesting attention."

Netlist proposes that this term be given its plain and ordinary meaning, but does not say what that means. "Plain and ordinary meaning" is the plain and ordinary meaning to a skilled artisan, not any interpretation that may be twisted to fit the terms. And in any event, SK hynix's interpretation is the plain and ordinary meaning of the term.

**5. "notification signal" / "Notification signal to the memory controller indicating at least one status of the at least one initialization sequence" ('837 patent)**

| SK hynix's proposed construction | Netlist's proposed construction |
|---|---|
| Signal notifying the memory controller of the status of the initialization sequence, not in response to polling | Plain and ordinary meaning |
| Signal notifying the memory controller of at least one status of the at least one initialization sequence, not provided in response to polling | A signal providing notification to the memory controller indicating whether a certain task, such as a training task requested by the system memory controller, of at least one initialization sequence, has been completed or is still being executed |

The Court should construe a "notification signal" to mean a "signal notifying the memory controller of the status of the initialization sequence, not provided in response to polling," and construe a "notification signal to the memory controller indicating at least one status of the at least one initialization sequence" to mean a "signal notifying the memory controller of at least one status of the at least one initialization sequence, not provided in response to polling."

This construction is consistent with both the intrinsic and extrinsic evidence. The claim language states that the notification signal "indicat[es] at least one status of the at least one initialization" to the memory controller. *E.g.*, JX-0006 at 14:16–18. The specification similarly describes the notification signal as "indicating at least one status of the at least one initialization sequence" to the memory controller. *Id.* at 4:15–20, 6:34–39.

The specification and Netlist's statements also disclaim polling from the scope of "notification signal." The specification disparages the "polling" method as "delaying the overall initialization process," which results in "inefficiency," while describing the "notifying method" as an "advantageous handshaking method." *Id.* at 3:30–52. The embodiments exclusively describe the memory module providing a signal to notify the memory controller of the status of the initialization sequence

without any prior polling from the memory controller. *Id.* at 4:15–20, 6:34–39; *see Saffran*, 712 F.3d at 558–60 (construing term based on term's consistent and exclusive use in all embodiments). Indeed, Netlist's complaint before the ITC states that the "notification signal ***eliminates*** the need for the host memory controller ***to poll*** the memory module to determine when the memory module has completed an initialization sequence." *In the Matter of Certain Memory Modules & Component Thereof, & Prods. Containing Same*, USITC Inv. No. 337-TA-1023, Compl. at 23 (emphasis added). And, Netlist's expert confirmed at trial that the patent generally disparages polling, and that "if it's a notifying signal, that it's not polling" because "the claims don't encompass polling." PX-3 at 437:19–438:16, 954:2–955:5. Thus, "notification signal" must exclude polling. *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (disclaimer applies "when the specification describes that feature as a 'very important feature . . . in an aspect of the present invention,' and disparages alternatives to that feature").

Netlist asserts that the term "notification signal" should be given its plain and ordinary meaning, but does not explain what that means. This is not the first time—before the ITC, Netlist refused to construe the term in its interrogatory responses, RX-0031C at 14–19, while its infringement expert, Mr. Mangione-Smith, opined that plain and ordinary meaning of "a notification signal" is a "signal that arrives at an unscheduled time . . . as compared to a polling system, which is scheduled." CX-0933C at Q/A 138; DX-4[5] at 334–35.

Setting aside the impropriety of this hidden construction, Mr. Mangione-Smith's construction is unsupported by the intrinsic evidence. The claims say nothing about scheduling or arriving at unscheduled times. The specification's discussion of polling and contrast of polling with the notification method focuses on whether the

---

[5] *In the Matter of Certain Memory Modules & Component Thereof, & Prods. Containing Same*, USITC Inv. No. 337-TA-1023, Complainant Netlist, Inc.'s Pre-Hearing Brief (Apr. 18, 2017) ("DX-4").

memory controller must first send a query to obtain the status of the initialization sequence—not whether the signal from the memory module is scheduled. JX-0006 at 3:25–28, 3:34–36; RX-1587C at Q/A 43–57; PX-3 at 404:3–23. Dr. Mangione-Smith reads far too much into the single sentence referring to scheduling: "polling generally involves scheduling polling intervals." JX-0006 at 3:25–43. First, he improperly reads "generally" to mean "always." Second, the single sentence, describing a possible characteristic of polling is not definitional. Finally, the '837 patent does not identify scheduled verses non-scheduled signaling as a distinction between the two methods, and indeed, a person of ordinary skill would have understood that "polling" can also be implemented to occur at unscheduled/unexpected times. RX-1587C at Q/A 82–83. Thus, the statement at most distinguishes between two types of polling (scheduled and unscheduled); it says nothing about the notifying method in the claims.

In its proposed construction of the broader term, Netlist asserts that "at least one status of the at least one initialization sequence" should be construed as "whether a certain task, such as a training task requested by the system memory controller, of at least one initialization sequence, has been completed or is still being executed." However, this is an improper attempt to change the term "initialization" to "training," and an attempt to read in the notion of "polling" (*i.e.*, querying or sending a request) into the definition of "notification," by using the phrase "requested by the system memory controller," even after admitting that "notification" does not encompass "polling."

**6. "a controller circuit" / "a notification circuit" ('837 patent)**

| SK hynix's proposed construction | Netlist's proposed construction |
|---|---|
| One or more [controller/notification] circuit(s) | An arrangement of discrete electrical elements formed in a single path through which electrical current can flow, that is separate from the memory elements and provides [control to the memory module/notification] |

For the construction of the term "a controller circuit" and "a notification circuit," the real dispute between the parties is whether "a" requires "a single" or "one or more" circuits.[6]

The proper construction of "a controller circuit" is "one or more controller circuit(s)."[7] The use of "a" preceding "controller circuit" requires that there be "one or more controller circuit(s)," especially when it follows the transitional phrase "comprising." *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016) (quoting *KCJ Corp. v. Kenetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)) ("[A]n indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one or more' is best described as a *rule*") (emphasis added). This rule applies unless "the language of the claims themselves, the specification, or the prosecution history necessitates a departure from the rule." *SanDisk Corp. v. Kingston Tech. Co., Inc.*, 695 F.3d 1348, 1360 (Fed. Cir. 2012). No such evidence exists here.

The specification nowhere disclaims more than one controller circuit.[8] In fact, the '837 patent expressly contemplates having more than one "controller circuits." *E.g.*, JX-0006 at 10:5–10 ("Thus, in certain such embodiments, the system memory controller 14 (*e.g.*, MCH) can only pull the notifying signal high when all memory modules 10, 26 or associated *controller circuits (e.g., local memory controllers)* have

---

[6] In the counterpart ITC case, Netlist also argued that the claim requires the controller circuit to be "separate from the memory devices." DX-4 at 404–05. However, Netlist's expert explained at trial that this argument is the same as the argument requiring a "single" controller circuit. PX-3 at 967:16–25.

[7] SK hynix's argument with respect to "a controller circuit" apply with equal force to "a notification circuit."

[8] While Netlist may point to particular embodiments or figures as depicting one controller circuit or one notification circuit, that is insufficient to overcome the general rule. *KCJ*, 223 F.3d at 1356.

completed the required or requested operation (*e.g*., initialization sequence).”); 5:39–42 (“the controller circuit 18 comprises one or more integrated circuits.”). The two patent applications incorporated by reference—the ’568 and ’047 Applications—further confirm that there can be more than one controller circuits in a memory module. *Id.* at 5:23–29.

In particular, Netlist cannot deny that the “register device” of the ’586 and ’047 Applications is a “controller circuit,” as claimed, because it accused the “register clock driver (RCD),” which is a register device that buffers and transmits the command and address signals to the DRAM chips, as the claimed “controller circuit.” *See* CX-0005 at Q/A 1323. Indeed, the ’586 and ’047 Applications explain that the “register 230,” receives and buffers a plurality of command signals and address signals and transmits them to the appropriate memory devices, either by a single register device or “a plurality of register devices.” DX-2 at [0074]; *see also* DX-3 at [0042]. As such, the ’586 and ‘047 Applications expressly state that the memory module can include a plurality of “register devices,” corresponding to the claimed “controller circuit(s),” as acknowledged by Netlist’s expert. DX-1 at 963:9–964:3.

Moreover, the ’837 patent uses “a” interchangeably with “at least one,” confirming rather than rebutting conformance with the general rule. *See, e.g*., JX-0006 at 1:64–67 (“a method of using *at least one memory module* comprises providing *a memory module*”), 1:42–2:10. Moreover, reading “a” to mean “one and only one” would render many embodiments in the ’837 patent unworkable. *See, e.g*., *id.* at 12:16–19 (“At block 206, the method 200 can include receiving ***a*** *notification signal* from the *at least one output* 12 of the memory module 10.”).[9] Regardless, calling out other limitations with multiple components by using “at least one” or “at least two” is insufficient to evince clear intent to limit the claims to one and only one controller

[9] If there are more than one “outputs,” each sending out a “notification signal,” it necessarily means that there must be more than one “notification signals.”

circuit. *See Scanner Tech. Corp. v. ICOS Vision Sys. Corp.*, 365 F.3d 1299, 1304–05 (Fed. Cir. 2004) (other limitations being described as "first" and "second" did not limit "a" to only one).

In addition to improperly construing "a," Netlist's proposed construction improperly separates the controller circuit from the memory elements. The term "memory element" appears nowhere in the claims nor the two patent applications incorporated by reference into the '837 patent. The specification's single, brief mention of "memory element," confirms that it is "not shown" in any of the figures. JX-0006 at 4:66–5:1. The fact that the "controller circuit" must be able to "control" the "memory element," *id.* at 5:20–23, does not require the "controller circuit" to be "separate from the memory element," as Netlist suggests. DX-4 at 404 ("The controller circuit cannot 'control' multiple memory elements of the memory module if it is embedded in every memory element."). If that were a requirement, the "controller circuit" would also be separate from the "memory module," because the '837 patent further states that the "controller circuit" also "controls the operation of the memory module," JX-0006 at 5:19–20, which cannot be right because the claim language expressly recites "[a] memory module comprising … a controller circuit," *id.* at claim 1. The '837 patent simply does not support Netlist's proposition that the "controller circuit" must be "separate from the memory elements."

### 7. "a controller circuit configured to cause the memory module to enter the initialization mode" ('837 patent)

| <u>SK hynix's proposed construction</u> | <u>Netlist's proposed construction</u> |
|---|---|
| No construction necessary (i.e., plain and ordinary meaning) | Printed circuit board having one or more memory integrated circuits |

The broader term "a controller circuit configured to cause the memory module to enter the initialization mode" should be construed in accordance with its plain and

ordinary meaning and requires no further elaboration.[10] "A controller" should mean "one or more controllers" regardless of whether the narrower phrase (*i.e.*, "a controller circuit") or the broader phrase (*i.e.*, "a controller circuit configured to cause the memory module to enter the initialization mode") for the same reasons set forth above.

**8. "mode" ('837 patent)**

| SK hynix's proposed construction | Netlist's proposed construction |
|---|---|
| No construction necessary (i.e., plain and ordinary meaning) | Distinctive behavioral state that a system may be switched to |

The Court should give the term "mode" its plain and ordinary meaning and reject Netlist's attempt to add further ambiguity into the language. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."). The term "mode" is consistently used in the intrinsic record to discuss the "two modes comprising an initialization mode … and an operational mode." *See, e.g.*, JX-0006 at 11:16–19. The term has no special meaning and requires no additional interpretation to understand.

Netlist's construction, by contrast, offers no clarity. Instead, it seeks to replace a single, commonly referenced word with a phrase that lacks any intrinsic support. The words "distinct," "behavioral" and "switched" do not exist in the specification. To construe "mode" as Netlist proposes does no more than present additional, less

[10] The plain and ordinary meaning of "a controller circuit" is "one or more controller circuit(s)." *See, e.g.*, *Scanner Techs. Corp. v. ICOS Vision Sys. Corp., N.V.*, 365 F.3d 1299, 1306 (Fed. Cir. 2004) ("Accordingly, we give the article '*an*' its *ordinary meaning* of '*one or more*' and hold that the '756 and '757 patents encompass apparatuses and methods using one or more illumination sources.") (emphases added).

supported terminology for later interpretations and constructions; that is, an improper exercise in redundancy. *U.S. Surgical Corp.*, 130 F.3d at 1568.

Further, the phrase proposed by Netlist contrasts the intrinsic record. The ’837 patent does not require a “mode” to have a “distinct behavior.” It explains that the system memory controller may cause the memory module to “perform standard operations” while in an operational mode; however, in certain embodiments, these standard operations can also be performed in initialization mode. JX-0006 at 6:27–33.

**9. “memory module” (’837 patent)**

| SK hynix’s proposed construction | Netlist’s proposed construction |
|---|---|
| No construction necessary (i.e., plain and ordinary meaning) | Printed circuit board having one or more memory integrated circuits |

The term memory module should be construed as its plain and ordinary meaning. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206–07 (Fed. Cir. 2010) (approving district court’s decision not to construe a term and finding it had its “its plain and ordinary meaning” when defendant’s proposed construction “would unjustifiably narrow the term's broad scope”). The patentee chose the broad term “module” purposefully and Netlist’s attempts to narrow that phrase with specific embodiments is improper. Specifically, Netlist seeks to construe “memory module” as “printed circuit board having one or more memory integrated circuits.”

The ’837 patent discusses a “printed circuit board” and “integrated circuits” in the context of embodiments of the alleged invention, so Netlist’s attempt to narrow the claims based on these disclosures is improper. The specification repeatedly explains that a printed-circuit board is an embodiment: “FIG. 1 illustrates an ***example*** host computer system 16 including an ***example*** memory module 10 according to ***certain embodiments*** described herein.” JX-0006 at 4:3–5 (emphases added). That “memory module 10 ***may*** comprise a printed-circuit board (PCB) 22.” *Id.* at 4:21–22.

The specification also provides flexibility on construction of the memory module, rather than limiting to “one or more memory integrated circuits.” For

instance, the controller circuit (contained within the memory module) "can comprise one or more of a field-programmable gate array (FPGA), a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, and a complex programmable logic device (CPLD), for example." *Id.* at 5:34–39. The specification continues: "[i]n certain embodiments, the controller circuit 18 comprises ***various discrete electronic elements***, while in certain other embodiments, the controller circuit 18 comprises one or more integrated circuits." *Id.* at 5:39–42 (emphasis added). Nothing within the specification justifies limiting a memory module to "one or more integrated circuits" when a component of that memory module is not so-limited.

**10. "isolate" terms ('185 and '364 patents)**

| Claim term | SK hynix's proposed construction | Netlist's proposed construction |
|---|---|---|
| "selectively ***isolate***" ('185 patent) | "selectively ***electrically separating*** one component from another" | Plain and ordinary meaning |
| "selectively ***isolate*** at least one ***other memory device*** of the at least two corresponding memory devices from the system memory controller ***in response to the module control signals***" ('185 patent) | "selectively isolate" means "selectively ***electrically separating*** one component from another" Plain and ordinary meaning as to the rest of the term proposed for construction by Netlist. | "isolate at least one ***unselected*** memory device from the system memory controller ***during memory access operations***" |
| "***isolating*** a load associated with the at least one ***second memory device*** from the common set of the DQ and DQS signal lines" ('364 patent) | "***electrically separating*** at least the load of the second memory device from the common set of the DQ and DQS signal lines"[11] | "isolate the load of at least one second, ***unselected*** memory device, from the common set of the DQ and DQS signal lines" |

[11] In order to streamline the issues to be decided by the Court, SK hynix has added "set of the" to its proposed construction to match Netlist's proposed construction, thus eliminating any dispute.

Both the '364 and '185 patents generally concern "load isolation." *See* JX-0001, JX-0002. To achieve "load isolation," both patents claim functionality in a circuit (sometimes referred to as a buffer or logic element) that effectively acts as "a fork in the road" by selectively coupling the controller on the host computer to certain memory devices (thereby allowing data transmission to them) and selectively disconnecting other memory devices (thereby *isolating* those memory devices). *See, e.g.*, RX-0006C at Q/A 52–110, 152–85; RX-1584C at Q/A 42–51, 61–80, 130–38, 166–72; RDX-1584C.20–.36, .99–.103; *see also* JX-0007 ('364 file history); JX-0008 ('185 file history); JX-0049C (Solomon Dep., Aug. 13, 2019), JX-00045C (Bhakta Dep., Aug. 14, 2009), JX-00046C (Bhakta Dep., Sept. 17, 2010), JX-0044C (Solomon Dep., Jan. 27, 2017), JX-0047C (Lee Dep., Nov. 28, 2012), JX-0048C (Lee Dep., Oct. 10, 2014), JX-0027C (Lee Dep. Vol. 1, Jan. 31, 2017), JX-0028C (Lee Dep. Vol. 2, Feb. 1, 2017), JX-0029C (Lee Dep. Vol. 3, Mar. 1, 2017), (inventor depositions).

There are three different disputes that cut across the three claim terms above that are discussed below in turn:

**a. <u>"Isolation" means "electrical separation" in the context of the '364 and '185 patents</u>**

With respect to the term "isolation" found in the claim terms above, the Patent Office and even Netlist's own expert agree that it requires "electrical separation." PX-3 at 1015:21–23; RX-0006C at Q/A 114–31, 194–203; RX-1584C at Q/A 24–33. Yet Netlist refuses to accept that construction and insists upon the "plain and ordinary meaning" without saying what that means.

Netlist's expert, Dr. Baker, recently admitted at trial that "isolation always ***requires electrical separation***." PX-3 at 1015:21–23. That conclusion is consistent with the specifications and the extensive prosecution histories of the patents, including the Patent Office's explicit constructions of the same and similar terms in recent IPR proceedings. *See* RX-0006C at Q/A 114–31, 187–203.

The specifications of the '185 and '364 patents teach that isolating means

electrically separating. For example, as explained below, electrical separation is shown in Figure 5 of the ’185 patent:




The ’185 specification states that load reduction is achieved “by using the data transmission circuits 416 [shown in the red box in RDX-1584C.101 above] to ***electrically couple*** only the . . . memory devices 412 to which data is to be written [e.g., ranks A and C shown on the upper-right side of the “fork in the road” in RDX-1584C.101] . . . and to ***electrically isolate*** the other memory devices 412 from the memory controller 420 [e.g., ranks B and D in RDX-1584C.101].” JX-0002 at 14:35–41; *see also id.* at 11:23–29; RDX-1584C.102 (showing configuration when the other side of the “fork in the road” is electrically coupled); RX-1584C at Q/A 71–75. Similarly, the ’364 patent states, “[t]he isolation device ***selectively alternates*** between ***electrically coupling*** the first data signal line to the common data signal line and ***electrically coupling*** the second data signal line to the common data signal line.” JX-0001 at 3:35–38. The ’364 patent also provides a lengthy discussion of “isolation” in the context of Figures 6B to 6E and identifies the use of a FET switch as an “isolation device.” *See id.* at 24:35; RDX-1584C.21–.22 (showing how the switch creates a “fork

in the road”). A person of ordinary skill would understand that the FET switch ***electrically separates*** one component from another. RX-0006C at Q/A 116. The prosecution histories of each patent are in accord with the specification and demonstrate how important the “isolation” limitations were to allowance of the claims. *See* RX-0006C at Q/A 81, 117, 167, 192.

Finally, the Patent Office has repeatedly construed “isolate” to require “electrical separation.” In IPR2014-1369, the Patent Office construed “selectively isolate” in the ’185 patent to mean “***electrically separate*** one component from another.” RX-1461 at 7–8; *see also* RX-6C at Q/A 193. And in IPR2014-883, “selectively isolate” in a patent related to the ’364 patent was construed to mean “***electrical separation*** from one selected component from another selected component.” RX-1453 at 8–9; *see also* RX-0006C at Q/A 108, 118.

**b. Netlist improperly rewrites “other memory device” and “second memory device” to mean “*unselected* memory device”**

Netlist’s constructions of “other memory device” and “second memory device” improperly rewrite those terms to mean “***unselected*** memory device.” The words “other” and “second” are non-technical words that do not require construction for the jury, and they certainly do not mean “unselected.” Netlist is improperly rewriting its claims, after the fact, apparently to try to help its infringement case.[12] *See* RX-1584C at Q/A 61–62, 92, 102, 111, 117, 149–53. “This court . . . repeatedly and consistently has recognized that courts may not redraft claims . . ..” *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). The words “other” and “second” should be given their plain and ordinary meaning, and should not be rewritten to mean “unselected.” The Federal Circuit has recognized that “district courts are not (and should not be) required to construe *every* limitation present in a patent’s asserted

[12] At the recent ITC trial, the lawyer for the Government agreed with SK hynix that under the proper claim constructions, Netlist failed to “meet its burden of proving that the asserted claims of the asserted patents are infringed.” PX-3 at 91:15–16.

claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Instead, it is sufficient to give "other" and "second" their plain and ordinary meaning, thus rejecting Netlist's attempt to rewrite those words to mean "unselected." *See, e.g.*, *Finjan*, 626 F.3d at 1206–07 (affirming "plain and ordinary meaning" construction).

**a. Netlist improperly rewrites "in response to the module control signals" to mean "during memory access operations"**

Netlist's proposed construction for "in response to the module control signals" improperly rewrites that phrase to mean "during memory access operations." For reasons similar to those discussed in the section above, Netlist's proposed construction is legally improper. Netlist's construction is also directly contrary to the amendments and arguments Netlist was required to make to secure allowance of the claims. *See* JX-0008.766, -.767, -.776, -.991 (claim 1 was numbered 28 during prosecution); RX-0006C at Q/A 166–70; RX-1584C at Q/A 29, 102, 106–08. Netlist is trying to rewrite its claim to remove a causal relationship (apparently to make it easier to show infringement): the claim, as written, requires the act of "selectively isolat[ing]" to be done "***in response*** to the module control signals," whereas under Netlist's proposed construction no such causal relationship would exist. Under Netlist's proposed construction, the "selectively isolat[ing]" could be in response to ***any*** signal—or no signal at all(!)—so long as it happened to coincide with the period of time that "memory access operations" are taking place (which is essentially all of the time for a memory module). Netlist's proposal thus vitiates critical limitations in the claim, contrary to Federal Circuit precedent. *See, e.g.*, *Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) ("Claims must be 'interpreted with an eye toward giving effect to all terms in the claim.'"). The Court should give "in response to the module control signals" its plain and ordinary meaning, thus rejecting Netlist's attempt to vitiate that limitation. *See, e.g.*, *Finjan*, 626 F.3d at 1206–07.

**11.“selectively allow data transmission” (’185 patent)**

| Claim term | SK hynix’s proposed construction | Netlist’s proposed construction |
|---|---|---|
| “***selectively allow data transmission*** between the system memory controller and at least one selected memory device of the at least two ***corresponding*** memory devices ***in response to*** the module control signals” | No construction necessary (i.e., plain and ordinary meaning) | “***control the flow (e.g., timing, directionality) of data*** between the system memory controller and at least one selected memory device of the at least two ***connected*** memory devices ***based on*** control signals” |

Netlist’s proposed construction attempts to rewrite the clear language of the claim in three different places and thus should be rejected for reasons similar to those discussed in the two sections above.

The claim language “selectively allow data transmission” is the flip side of “selectively isolate” discussed above; together they create the “fork in the road” illustrated in RDX-1584C.101–02 where the claimed circuit toggles between one set of memory devices and another set of memory devices, thus “selectively allow[ing] data transmission” to the selected memory device(s) and “selectively isolat[ing]” the other memory device(s). *See supra* p. 20.

Netlist attempts to rewrite “selectively allow data transmission” to mean “control the flow (e.g., timing, directionality) of data,” again in an apparent attempt to make it easier to show infringement. *See* RX-1584C at Q/A 28–29, 117–21. The claim, as written, says nothing about the timing or directionality. Instead, it expressly requires the “circuit” to selectively allow data transmission to one set of memory devices and ***not*** to another set of memory devices (thus creating a “fork in the road”). Netlist’s proposed construction would eliminate that requirement and allow data transmission to ***all*** of the memory devices so long as there was a split-second delay in

the "timing" of any of those transmissions. In other words, Netlist wants to eliminate the "fork in the road" required by the claims and instead allow two parallel roads where each road has a mere "speed bump" along the way. As discussed in the section above, Netlist's attempt to rewrite the claim language after the fact is legally improper.

Next, Netlist attempts to rewrite "corresponding memory devices" with "connected memory devices," again is an apparent attempt to make it easier to show infringement. The claimed invention requires two paths (and a "fork in the road" leading to those two paths), with "corresponding" memory devices on each path, where the "circuit" will select the memory devices on one path (and allow data transmission to them) and isolate the other memory devices on the other path. For example, as shown in RDX-1584C.101–03, path A leads to memory device "A," and the "corresponding" memory device "B" is on path B. *See* JX-0002 at 15:15–21 (discussing "path A and path B"). Netlist's proposed construction improperly replaces the word "corresponding" with "connected" to try to eliminate the "fork in the road" required by the claim language. For example, memory devices A and C—which are both on the ***same*** path, meaning the "circuit" cannot select one or the other—would satisfy Netlist's proposed construction (since they are both "connected" to the circuit), even though they are ***not*** "corresponding" memory devices as required by the claims. Memory devices A and B are the "corresponding" memory devices because the "circuit" can select one or the other. *See* JX-0002 at 15:15–21; RDX-1584C.101–03.

Finally, Netlist rewrites "in response to the module control signals" to mean "based on control signals," again in an apparent attempt to make it easier to show infringement. As discussed above, "in response to" requires a causal relationship, which Netlist's proposed construction improperly tries to eliminate.

It is sufficient for the Court to give this claim term its plain and ordinary meaning, thus rejecting all three of Netlist's attempts to rewrite the claim language to mean something else. *See, e.g.*, *Finjan*, 626 F.3d at 1206–07.

**12.“output control signal” (’185 patent)**

| Claim term | SK hynix’s proposed construction | Netlist’s proposed construction |
|---|---|---|
| “output control signals” | “the information output on control signal lines for a particular memory access” | Plain and ordinary meaning |

Although the parties disagree on the precise meaning of “output control signal,” SK hynix believes that the Court need not resolve the dispute at present because the precise construction does not appear to be material to either side’s position on infringement or invalidity. *See* Joint Claim Construction Statement at 3–4 (filed May 19, 2017) (Doc. 117) (neither party indicating that this term is material); *see also SK hynix Inc. v. Netlist, Inc.*, Case No. IPR2017-00549, Paper No. 7 at 4 (PTAB May 15, 2017) (instituting inter partes review of the ’364 patent without resolving the precise construction for “output control signals”).

## III. CONCLUSION

For the foregoing reasons, the Court should adopt SK hynix’s proposed constructions of the disputed terms.

Dated: May 26, 2017

By: /s/ Brian R. Nester

Chad S. Hummel (Bar No. 139055)
<chummel@sidley.com>
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, California 90067
Telephone: (650) 595-9500
Facsimile: (650) 595-9501

Theodore W. Chandler (Bar No. 219456)
<tchandler@sidley.com>
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

David T. Pritikin (*pro hac vice*)
<dpritikin@sidley.com>
Richard A. Cederoth (*pro hac vice*)
<rcederoth@sidley.com>
David Giardina (*pro hac vice*)
<dgiardina@sidley.com>
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Brian R. Nester (*pro hac vice*)
<bnester@sidley.com>
Wonjoo Suh (Cal. Bar No. 269500)
<wsuh@sidley.com>
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Kenneth L. Nissly (Bar No. 77589)
<knissly@nisslylaw.com>
LAW OFFICES OF KENNETH L. NISSLY
P.O. Box 3448
Saratoga, California 95070
Telephone: (408) 398-7043

*Attorneys for Defendant and Counterclaim-Plaintiff SK hynix Inc. and Defendants SK hynix America Inc. and SK hynix memory solutions Inc.*